UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
ROBERT LEACH and KEESHA LEACH,

               Plaintiffs,

        - against -

RAFAIL KAYKOV, J. FLETCHER CREAMER
& SON, INC., and ROYAL DISPATCH
SERVICE, INC.,

               Defendants.
-----------------------------------X

**MEMORANDUM AND ORDER**

07-CV-4060 (KAM)(VVP)

**MATSUMOTO, United States District Judge:**

        Plaintiffs Robert W. Leach and Keesha Leach
(collectively, the "plaintiffs") brought this diversity suit,
alleging causes of action sounding in negligence for personal
injuries and loss of consortium against defendants Rafail M.
Kaykov ("Kaykov"), J. Fletcher Creamer & Sons, Inc.
("Fletcher"), and Royal Dispatch Service, Inc. ("Royal")[1]. (ECF
No. 27, Second Am. Compl. ("Compl.") ¶¶ 1-2, 43-71.) Robert
Leach ("Leach") alleges that he suffered personal injuries from
a motor vehicle accident in New Jersey between a livery vehicle,
in which he was a passenger and which was driven by Kaykov, and
a vehicle leased and operated by Fletcher. (*Id.* ¶¶ 1-6, 14-15,
20, 35, 38, 40-54.) On December 8, 2008, Fletcher filed cross-

---

[1] Claims against defendant M&M Royale Limousine, Inc. were discontinued with
prejudice by the parties on July 2, 2008 and entered by the court on December
29, 2008. (*See* ECF No. 40, Stipulation of Discontinuance.)

1

claims for contribution and/or indemnification[2] against Kaykov

and Royal, which dispatched Kaykov's livery vehicle. (ECF No.

37, Verified Answer to Second Am. Compl. ("Fletcher Answer")

¶¶ 30-33.) On March 25, 2009, Kaykov and the plaintiffs entered

into a stipulation discontinuing with prejudice all of their

respective claims against Royal. (ECF No. 86, Stipulation of

Discontinuance.) Accordingly, Fletcher's two cross-claims are

the only claims against Royal remaining in this action.

Royal now moves for summary judgment pursuant to

Federal Rule of Civil Procedure 56(b) to dismiss both of

Fletcher's cross-claims asserted against Royal on the grounds

that the undisputed facts establish that Royal cannot be held

vicariously liable for the torts of Kaykov, and thus, Royal

cannot be liable to Fletcher for contribution or indemnification

as a matter of law in the event that Fletcher and Kaykov are

found to be joint tortfeasors. (ECF No. 82, Mem. of Law in

Supp. of Royal Dispatch, Inc.'s Mot. for Summ. J. ("Royal's Mem.

in Supp.").) Fletcher opposes the motion, arguing that there

are questions of fact as to the degree of control Royal

exercised over Kaykov, which preclude summary judgment. (No.

78, Mem. of Law in Opp. ("Fletcher's Mem. in Opp.").) The court

heard oral argument on February 28, 2011, and, at the conclusion

---

[2] Although Fletcher entitles its first cross-claim "Common Law
Indemnification" and its second cross-claim "Common Law Negligence," as will
be set forth more fully, *infra*, the cross-claims, as pleaded, are for
indemnification and contribution, respectively.

of the hearing, the parties declined the court's invitation to make any further submissions. (Tr. of Oral Argument, dated 2/28/11 ("2/28/11 Tr.") at 30, 35; 2/28/11 Minute Entry.) For the following reasons, Royal's motion for summary judgment is granted in part and denied in part.

## BACKGROUND

### I. Facts[3]

The material facts regarding Fletcher's cross-claims for contribution and/or indemnification based on the parties' submissions are as follows.

#### A. The Accident

On July 17, 2007, Leach returned to New York after a business trip. (Royal's 56.1 Statement of Material Facts ("Royal's 56.1") ¶ 1; Fletcher's 56.1 Counterstatement of Material Facts ("Fletcher's 56.1") ¶ 1; Ex. T, Robert Leach's Deposition ("Pl.'s Dep.") at 13-17.) Through Royal, Leach's employer arranged for a livery car to drive Leach from New York to his home in Pennsylvania. (Royal's 56.1 ¶¶ 2-3; Fletcher's 56.1 ¶¶ 2-3; Ex. T, Pl.'s Dep. at 16-18.) Royal dispatched a black Lincoln Town Car,[4] owned, insured, and driven by Kaykov, to

---

[3] The following facts, taken from the parties' statements pursuant to Local Civil Rule 56.1 and the admissible evidence contained in the exhibits cited and annexed to the parties' motion papers, are undisputed unless otherwise indicated. References to paragraphs of the parties' 56.1 statements include materials cited therein and annexed thereto.

[4] "Lincoln Town Car" refers to the make and model of Kaykov's car. (Ex. U, Kaykov's 12/5/08 at 9.)

take Leach to his home in Pennsylvania.  (Royal's 56.1 ¶¶ 2-3;
Fletcher's 56.1 ¶¶ 2-3; Ex. U, 12/5/08 Dep. of Def. Rafail
Kaykov ("Kaykov's 12/5/08 Dep.") at 40.)

En route to Pennsylvania, the car was involved in a
motor vehicle accident while traveling westbound on Route 80 in
the Township of Mount Olive, County of Morris, New Jersey.
(Royal's 56.1 ¶ 3; Fletcher's 56.1 ¶ 3; Ex. U, Kaykov's 12/5/08
Dep. at 38; Compl. ¶¶ 1-3.)  Although the parties disagree as to
the exact events leading up to the accident (*compare* Royal's
56.1 ¶ 3; Ex. U, Kaykov's 12/5/08 Dep. at 38-67; Compl. ¶¶ 1-3;
Ex. R, Photographs; Ex. V, 1/8/09 Deposition of Kaykov
("Kaykov's 1/8/09 Dep.") at 154 *with* Fletcher's 56.1 ¶ 3; Ex. W,
1/8/09 Dep. of Theodore Sudal ("Sudal 1/8/09 Dep.") at 8, 38-40,
56, 57, 59, 75, 90; Ex. X, 1/9/09 Dep. of Theodore Sudal ("Sudal
1/9/09 Dep.") at 33), it is undisputed that the Lincoln Town
Car, owned, insured, and operated by Kaykov, struck a
construction vehicle leased and operated by Fletcher, which was
stopped in the left lane of traffic on Route 80.  (Royal's 56.1
¶¶ 2-3, 8; Fletcher's 56.1 ¶¶ 2-3, 8; Ex. R, Photographs.)
Leach alleges he suffered severe and permanent personal injuries
from this accident and his wife, Keesha Leach, alleges that she
suffered loss of consortium due to her husband's injuries.
(Compl. ¶¶ 5-6, 52, 64, 70-71.)

B. The Relationship between Royal and Kaykov

Royal operates a vehicle-for-hire dispatch service that receives calls from customers who want to be driven from one location to another. (Royal's 56.1 ¶ 10; Fletcher's 56.1 ¶ 10; Ex. Y, Dep. of Amnon Oberlander, Franchise Liaison ("Oberlander Dep.") at 5-6.) Royal refers each call to a driver through a computer system required and installed by Royal in every driver's car; the driver may ignore, reject, or accept each call offered to him or her by Royal. (Royal's 56.1 ¶ 10; Fletcher's 56.1 ¶ 10; Ex. Y, Oberlander Dep. at 6, 8.)

Kaykov has driven for Royal since he entered into a franchise agreement (the "Franchise Agreement") with Royal on or about April 3, 2000.[5] (Royal's 56.1 ¶ 4; Fletcher's 56.1 ¶ 4; Ex. O, Franchise Agreement.) The Franchise Agreement between Kaykov and Royal identifies drivers, like Kaykov, as "franchisees" of Royal and defines a "franchisee" as "an independent businessman" who is "not deemed to be an employee or agent of [Royal]." (Ex. O, Franchise Agreement ¶ 41.) As per the Franchise Agreement, Kaykov independently owns his Lincoln

---

[5] On April 3, 2000, the same day he entered into the Franchise Agreement with Royal, Kaykov also entered into an "Exchange Agreement" with Royal, which Royal represents was "executed for business reasons relating to the consideration of business between Royal and TKO Fleet, another franchisor." Royal's 56.1 ¶ 4; *see also* Fletcher's 56.1 ¶ 4; Ex. P, Exchange Agreement.) Because the Exchange Agreement only contains a few supplemental terms that are, on the whole, redundant of the terms within the Franchise Agreement itself, the court herein refers to Exchange Agreement and the Franchise Agreement collectively as the "Franchise Agreement." (Royal's 56.1 ¶ 4; Fletcher's 56.1 ¶ 4.)

Town Car, for which he carries his own insurance and maintains his own New York State Driver's license and New York City Taxi and Limousine Commission License. (Royal's 56.1 ¶ 8; Fletcher's 56.1 ¶ 8; Ex. J, Department of Motor Vehicles Registration; Ex. K, Automobile Insurance Card; Ex. L, New York City Taxi and Limousine License.)

### C. Royal's Dispatch Services Generally

Royal's dispatch service, as governed by the policies and procedures contained within the Franchise Agreement and the Rulebook, described *infra*, functions on a day-to-day basis as follows. Royal advertizes its dispatch services to companies in the tri-state area. (Ex. Y, Oberlander Dep. at 6-8.) Any company can open an account with Royal, which entitles the company to authorize its employees to use vehicles dispatched by Royal. (*Id*. at 6-8.) When an account-holding company would like a car to pick up one of its employees, the company calls Royal, which then dispatches the request to one of its drivers.[6] (*Id*. at 6-8.)

Passenger pick-ups are assigned to and can be accepted or rejected by drivers via a computer system. (Royal's 56.1 ¶¶ 7, 10; Fletcher's 56.1 ¶¶ 7, 10; Ex. Y, Oberlander Dep. at 8, 22; Ex. O, Franchise Agreement ¶ 1.) Royal requires the use of

---

[6] Because a franchisee may drive his or her own vehicles and/or hire employees to drive the vehicle, the court uses "driver" herein to refer to both the franchisee and his or her employee-driver. (Ex. O, Franchise Agreement ¶ 10.)

and installs these computer systems, at each franchisee's expense, in each franchisee's car. (Royal's 56.1 ¶ 7; Fletcher's 56.1 ¶ 7; Ex. Y, Oberlander Dep. at 22; Ex. O, Franchise Agreement ¶ 1.) Franchisees, including Kaykov, provide Royal with a security deposit in exchange for the computer equipment. (Royal's 56.1 ¶ 7; Fletcher's 56.1 ¶ 7; Ex. O, Franchise Agreement ¶¶ 2, 3(c).) The security deposit is reimbursed upon termination of the Franchise Agreement and return of the equipment in good condition. (Royal's 56.1 ¶ 7; Fletcher's 56.1 ¶ 7; Ex. O, Franchise Agreement ¶ 3(c).)

The computer system can provide route assistance if requested by the driver, but otherwise the driver determines the route he or she will take using his or her own personal GPS device or his or her personal knowledge. (Royal's 56.1 ¶ 7; Fletcher's 56.1 ¶ 7; Ex. U, Kaykov's 12/5/08 Dep. at 29; Ex. V, Kaykov's 1/8/09 Dep. at 116-17; Ex. Y, Oberlander Dep. at 57-58.) The computer does not provide any updates regarding construction and/or road closures. (Royal's 56.1 ¶ 7; Fletcher's 56.1 ¶ 7; Ex. V, Kaykov's 1/8/09 Dep. at 118-19; Ex. Y, Oberlander Dep. at 57-58.) In addition to the computer system, each franchisee's car, including Kaykov's, is equipped with a GPS device, which the Rulebook requires the drivers to supply. (Royal's 56.1 ¶ 7; Fletcher's 56.1 ¶ 7; Ex. Q, Rulebook at 3-4.)

Royal asserts that it does not provide any training for the franchisees, including training on how to use the computer system. (Royal's 56.1 ¶ 11; Ex. Y, Oberlander Dep. at 43.) However, Fletcher points to admissible evidence demonstrating that Royal requires its franchisees to attend and satisfactorily pass a training course on how to properly use and operate the computer system and that Royal retains the ability to compel the drivers to attend further training sessions if the driver "needs further training in [Royal's] sole but reasonable judgment." (Fletcher's 56.1 ¶ 11; Ex. O, Franchise Agreement at ¶¶ 20, 20(a).)

When the vehicle dispatched by Royal arrives at the destination, rather than paying the driver directly, the passenger gives the driver a voucher to verify his or her use of the car service. (Royal's 56.1 ¶ 6; Fletcher's 56.1 ¶ 6; Ex. Y, Oberlander Dep. at 6-8; Ex. O, Franchise Agreement ¶¶ 27-30.). The driver gives the voucher to Royal and Royal collects the amount indicated on the voucher from the account-holding company. (Royal's 56.1 ¶ 6; Fletcher's 56.1 ¶ 6; Ex. Y, Oberlander Dep. at 47-48; Ex. O, Franchise Agreement ¶¶ 27-30.) After the drivers submit the vouchers to Royal and Royal collects the money from the passengers, Royal then disburses payment to the drivers, and withholds a commission for itself. (Royal's 56.1 ¶ 6; Fletcher's 56.1 ¶ 6; Ex. Y, Oberlander Dep.

at 8-13; Ex. U, Kaykov's 12/5/08 Dep. at 22-24.)  The commission

withheld by Royal ranges from 18-24% of the total fare

collected, depending on how quickly the driver chooses to be

paid.[7]  (Royal's 56.1 ¶ 6; Fletcher's 56.1 ¶ 6; Ex. O, Franchise

Agreement at ¶¶ 27-30.)

Drivers are responsible for servicing their own

vehicles and repairing or replacing the vehicle if it breaks

down or is otherwise damaged at the service stations of his or

her choice.  (Ex. O, Franchise Agreement ¶¶ 8, 9.)

D. The Franchise Agreement and the Rulebook

As noted, *supra*, two documents govern the overall

operation of Royal's dispatch service as well as the

relationship between Royal and its franchisees: the Franchise

Agreement and the Rulebook.  (Royal's 56.1 ¶ 5; Fletcher's 56.1

¶ 5; Ex. Q, Rulebook; Ex. O, Franchise Agreement.)  The details

of these two documents are as follows.

The Franchise Agreement defines the contractual

relationship between Royal and its franchisees.[8] (Royal's 56.1

¶ 5; Fletcher's 56.1 ¶ 5.)  By means of the Franchise Agreement,

the franchisee is purchasing a Royal franchise, which is,

---

[7] Royal withholds a higher percentage (24%) if the driver requests
disbursement within one week of submitting the vouchers and withholds the
lowest percentage (18%) if the driver waits three weeks for disbursement.
(Royal's 56.1 ¶ 6; Fletcher's 56.1 ¶ 6; Ex. O, Franchise Agreement ¶ 29.)
[8] As noted, Kaykov entered into the Franchise Agreement with Royal on or about
April 3, 2000.  (Royal's 56.1 ¶ 4; Ex. O, Franchise Agreement.)  Accordingly,
all of the rules that apply to franchisees in general also apply to Kaykov.

essentially, the right to receive clients from the franchisor-dispatcher, Royal, in the manner described in the Franchise Agreement. (Ex. O, Franchise Agreement ¶ 1.) In exchange for this right, the franchisee pays the franchisor a flat purchase price or "Franchise Fee," which, for Kaykov, was $20,000. (*Id.* ¶ 3.) A franchisee must also pay a one-time security deposit for the computer equipment, weekly dues of $50, and a commission for each job the franchisee completes. (Ex. O, Franchise Agreement ¶¶ 3, 5, 29.) These fees are subject to change at Royal's discretion. (*Id.* ¶ 5(i)(b).)

In addition, the Franchise Agreement includes details of the means of the business' operations (such as the payment scheme and computer systems as described, *supra*), sets forth Royal's requirements of its franchisees, the transferability and termination of the franchise, and the extent to which Royal oversees, directs, or controls its franchisees, including the creation of a Franchisees' Committee. (Royal's 56.1 ¶¶ 5, 7, 9; Fletcher's 56.1 ¶¶ 5, 7, 9; Ex. O, Franchise Agreement.)

Specifically, the Franchise Agreement requires each franchisee, including Kaykov, to own his or her own four-door Lincoln Town Car or Cadillac that is not more than three years old, to carry his or her own liability and worker's compensation insurance, and to maintain his or her own New York City Taxi and Limousine Commission License. (Royal's 56.1 ¶ 8; Fletcher's

56.1 ¶ 8; Ex. J, Department of Motor Vehicles Registration; Ex.
K, Automobile Insurance Card; Ex. L, New York City Taxi and
Limousine License; Ex. O, Franchise Agreement ¶¶ 7, 10, 11.)
The Franchise Agreement further requires that franchisees list
Royal as a party to be notified in case of insurance
cancellation and reserves Royal's right to purchase the
necessary insurance and to deduct the cost of that insurance
from any money due to the franchisee.  (Royal's 56.1 ¶ 8;
Fletcher's 56.1 ¶ 8; Ex. O, Franchise Agreement ¶ 10.)

         The Franchise Agreement is not exclusive, and
franchisees, like Kaykov, retain the right to contract with
other franchisors and/or chauffer private clients, "even where
such clients were originally procured through Royal - with no
future requirement for a commission to be paid to Royal."
(Royal's 56.1 ¶ 9; *see also* Fletcher's 56.1 ¶ 9; Ex. Y,
Oberlander Dep. at 15, 47.)  In addition, franchisees may hire
their own drivers or employees upon receipt of Royal's written
approval, and the franchisee assumes full responsibility for the
drivers' conduct and obligations to Royal.  (Ex. O, Franchise
Agreement ¶¶ 20-22.)

         Under the Franchise Agreement, a franchisee has the
right to divest, sell, transfer, or assign his franchise,
subject to Royal's written consent, which "will not be
"unreasonably withheld."  (Royal's 56.1 ¶ 9; Fletcher's 56.1

¶ 9; Ex. O, Franchise Agreement ¶ 32; Ex. Y, Oberlander Dep. at 25.)  Either party may cancel or terminate the Franchise Agreement at will within the first 90 days after signing without penalty; if the franchisee voluntarily terminates the Franchise Agreement at any time thereafter or if Royal terminates the Franchise Agreement "for cause," the franchisor will not be reimbursed the original Franchise Fee.  (Ex. O, Franchise Agreement ¶¶ 33-36.)  The franchisee, however, will have the opportunity to sell, assign, or transfer the franchise within 120 days of the termination, regardless of the reason for the termination.  (*Id.* ¶ 40.)

The Franchise Agreement contains a list of actions that could constitute a material breach of the Franchise Agreement, or "for cause" termination, by either the franchisee or franchisor.  (*Id.* ¶¶ 35(a), 36.)  Breaches by the franchisee include, *inter alia*, violating the law, failing to "maintain Franchisee's vehicle in excellent condition and offer professional courteous and efficient service," failing to maintain the required insurance or to indemnify Royal for any damages recovered from Royal by a third-party because of actions of the franchisee or the franchisee's employee, engaging in unsafe or reckless driving or other behavior which affects Royal's "reputation and goodwill."  (*Id.* ¶¶ 22, 35(a).)  The Franchise Agreement further contains a catchall provision that

allows Royal to terminate the Franchise Agreement for cause due to a franchisee's breach of "any other term or condition of this Agreement, notwithstanding that such breach has not been particularized in the foregoing list." (*Id.* ¶ 35(a)(i)(B).) As will be discussed in further detail below, it is also a material breach of the Franchise Agreement if the Franchisees' Committee finds that a franchisee has committed a "serious breach" of the Rulebook. (*Id.* ¶ 35(a)(i).)

The range of possible material breaches by the franchisor is significantly more constrained, (*see id.* 36 (a material breach is considered "any breach by Franchisor under Sections 1 [installation of the computer equipment], 23 [franchisee must indemnify the franchisor], 24 [operation of dispatch system], 25 [jobs will be distributed among franchisees], and 28 [definition of voucher income] of this Agreement")), and there is no similar catchall provision applicable to franchisor breaches.

Finally, the Franchise Agreement describes the extent to which Royal oversees, directs, or controls its franchisees. The Franchise Agreement first states that a franchisee is "not deemed to be an employee or agent of [Royal]." (*Id.* ¶ 41.) It further provides, *inter alia*:

> Franchisee shall at all times be free from the control
> or direction of the Franchisor in the operation of
> Franchisee's vehicle, and the Franchisor shall not

> supervise or direct the services to be performed by
> Franchisee; except as specifically set forth herein or
> in the Franchisor's [R]ulebook, which supervision or
> direction is set forth primarily for the benefit of
> all Franchisees.

(*Id.*; *see also* Royal's 56.1 ¶ 5; Fletcher's 56.1 ¶ 5.)

The Franchise Agreement contemplates the existence of a Franchisees' Committee, "comprised of Franchisees, formed and elected by the Franchisees to protect the interests of all of the Franchisees," to develop, implement, and enforce the rules and regulations contained in a "Rulebook," which is described below.[9] (Ex. O, Franchise Agreement ¶ 18; Ex. Q, Rulebook at 1.) The Franchise Agreement specifically requires the franchisees "to abide by all the rules and regulations presently set forth in the Rulebook . . . or any reasonable rules and regulations which may hereinafter be promulgated and enforced by the Franchisees' Committee[]." (Ex. O, Franchise Agreement ¶ 18; 2/28/11 Tr. at 3 (Royal's counsel conceding that Royal requires the franchisees to comply with the Rulebook).)

The Rulebook, attached as Exhibit Q to Royal's Notice of Motion, is provided to all franchisees, including Kaykov. (Royal's 56.1 ¶ 5; Fletcher's 56.1 ¶ 5; Ex. Q, Rulebook.) The first page of the Rulebook welcomes the franchisee to "Royal Dispatch Services, Inc.," and continues, "[w]e are a group of

---

[9] Royal franchisees have the opportunity to vote for representatives or run for a position on the Franchisees' Committee. (*See* Ex. Q, Rulebook at 21-24.)

luxury car franchisees," and "[t]his is our rules and regulations book.  It developed [sic] by the Franchisees elected Membership Board and the franchisees['] committee."  (Ex. Q, Rulebook at 1.)  The Rulebook lays out the detailed aesthetic and operational rules with which the franchisees are required to comply, such as requirements for drivers' attire, conduct, attitude toward passengers and other drivers, vehicle cleanliness and inspections, and shift requirements.  (*See generally id.*)  For example, drivers are required to wear dress pants, a white shirt, a tie, a "black, dark gray, navy blue, or a dark suit," dark shoes and no hat and must be "clean, groomed and smell fresh every single day."  (*Id.* at 2.)  Drivers must get out of the car to assist passengers with luggage and, when dropping of passengers at night, must wait until the passenger is safely inside the house, office, or building before leaving. (*Id.*)  The driver's car must be clean and carry a GPS, a telephone, a rate book, at least one voucher pack, a pen, and small clip board, among other items, and the driver's attire and their vehicles are subject to random inspection by Franchisees' Committee members at any time the franchisee's car is working. (*Id.* at 3-4, 12).  A company magnetic sign with the driver's car number must be on the back panel of the vehicle's trunk when the driver is working.  (*Id.* at 5.)

Further, although the Rulebook generally allows drivers to set their own schedule and hours, it requires each driver to work at least one shift per week between 4 A.M. and 9 A.M. (Royal's 56.1 ¶ 10; Fletcher's 56.1 ¶ 10; Ex. V, Kaykov's 1/8/09 Dep. at 122; Ex. Q, Rulebook at 10.) However, Royal argues that, although the weekly 4 A.M. and 9 A.M shift is required of franchises by the Rulebook, in practice, that requirement is not enforced. (*See* 2/28/11 Tr. at 8; Royal's 56.1 ¶ 10; Ex. Y, Oberlander Dep. at 43-45; Ex. V, Kaykov's 1/8/09 Dep. at 122.) The Rulebook also requires the franchisees' vehicles to be inspected every four months, although the parties dispute whether the inspections are performed by franchisees independent of Royal's control or whether Royal selected the franchisees to perform the inspections. (Royal's 56.1 ¶ 11; Fletcher's 56.1 ¶ 11.)

Moreover, the Rulebook provides procedures that must be followed before sanctions may be imposed on the franchisees in the event that a driver violates any of the rules contained in the Rulebook. (*See* Ex. Q, Rulebook at 24-26.) The procedures include a hearing, judged by a Franchisees' Committee officer, the opportunity to present witnesses, and an option to appeal to the Franchisees' Committee.[10] (*Id.*) The Franchisees'

---

[10] The Rulebook refers to an appeal before the "Membership Board" which is used interchangeably with "Franchisees' Committee" throughout the Rulebook. (Ex. Q, Rulebook.)

Committee may impose sanctions, such as citations, warnings, or fines.  (*Id.* at 24-32; Fletcher's 56.1 ¶ 35.)

According to the Franchise Agreement, Royal does not determine whether sanctions should be imposed or issue sanctions, unless the franchisee commits a material breach of the Franchise Agreement, in which case Royal may unilaterally terminate the franchise.  (Ex. O, Franchise Agreement ¶ 35(a)(i).)  However, in the event the Franchisees' Committee imposes a fine, the Franchise Agreement provides that Royal may withhold an unpaid fine from the drivers' vouchers, and turn the fine over to the "Executive Driver Sunshine Fund, Inc.," a franchisee fund set up by the Franchisees' Committee for the benefit of franchisees.  (*Id.*)  Furthermore, if, after following the review procedures outlined in the Rulebook, the Franchisees' Committee determines that the franchisee "has committed a serious breach of the Franchisees' Committee rules and regulations," then the Franchisees' Committee may recommend termination of the franchisee to Royal and, based on that recommendation, Royal has the option of terminating an individual's Franchise Agreement on the ground that the franchisee "committed a serious breach of the Franchisees['] Committee rules and regulations."  (*Id.*)

Importantly, the parties dispute whether Royal or the Franchisees' Committee develops, implements, and enforces the

Rulebook. (Royal's 56.1 ¶ 5; Fletcher's 56.1 ¶ 5.) Royal asserts that the evidence in the record establishes that the Franchisees' Committee creates the Rulebook and points to the deposition of Royal's Franchisee Liaison, Amnon Oberlander, and to an affidavit from Arsen Aulov, a franchisee and a Franchisees' Committee member, in support of this assertion. (Royal's 56.1 ¶ 5; Ex. Y, Oberlander Dep. at 29-30, 34; Ex. Z, Affidavit of Arsen Aulov.) Fletcher, however, argues that Royal created the Rulebook and points to Kaykov's statement in his deposition that Royal may have created the Rulebook. (Fletcher's 56.1 ¶ 5; Ex. V, Kaykov's 1/8/09 Dep. at 159 ("Q: Do you know if the drivers themselves put together [the Rulebook] instead of the company? A: responded, "I don't know that. I think the company did.")

Further, the parties dispute whether the incorporation of the Rulebook into the Franchise Agreement is indicative of Royal's retention of control over its franchisees, or whether the Rulebook, although referenced in the Franchise Agreement, has no bearing on Royal's relationship with its franchisees. In fact, both Royal and Fletcher point to different parts of the same sentence in paragraph 41 of the Franchise Agreement to support of their respective arguments. (*Compare* Royal's 56.1 ¶ 5 (emphasizing that the "[f]ranchisee shall at all times be free from the control or direction of the franchisor in the

operation of franchisee's vehicle, and the franchisor shall not supervise or direct the services to be performed by franchisee . . ." *with* Fletcher's 56.1 ¶ 5 (emphasizing the qualification of control by the Rulebook, specifically, that "franchisor shall not supervise or direct the services to be performed by franchisee; except as specifically set forth herein or in the franchisor's [R]ulebook".)

II.    Fletcher's Cross-Claims

On December 8, 2008, Fletcher answered the Second Amended Complaint and alleged two cross-claims against Royal. (Fletcher Answer ¶¶ 30-35.)  Fletcher's first cross-claim, which is entitled "Common Law Indemnification," alleges that if the plaintiffs recover against Fletcher for damages which are due in whole or in part to the acts of Royal or its agents, servants, or employees, then Royal has an obligation to "indemnify" Fletcher in full or part for any judgment against Fletcher. (*Id.* ¶¶ 30-32.)  Although Fletcher's counsel conceded at the oral argument that, based on the relationship between the parties, Fletcher is ultimately unlikely to be able to recover on a theory of indemnification, as opposed to contribution, he declined to abandon his indemnification cross-claim, and declined to make further submissions to the court.  (2/28/11 Tr. at 35.)  For the reasons set forth below, the court grants Royal's motion for summary judgment on Fletcher's cross-claim

for common law indemnification, albeit on different grounds than those asserted by Royal.

Fletcher's second cross-claim, which is entitled "Common Law Negligence," in fact, seeks contribution from Royal if the plaintiffs recover against Fletcher under the same circumstances as set forth in Fletcher's first cross-claim. (*See* Fletcher's Answer ¶ 34 ("[I]f plaintiff(s) should recover judgment against [Fletcher], [Royal] shall be liable to [Fletcher] on the basis of apportionment of responsibility for the alleged occurrence and [Fletcher] is entitled to contribution . . . .").) Based on the plain language of the second cross-claim, as well as the fact that both parties refer to these cross-claims as ones for "indemnification and/or contribution" throughout their papers, the court interprets the second cross-claim to be one for contribution, not negligence. Indeed, Fletcher admitted in its 56.1 Statement that the only remaining claims "against Royal are the cross claims for common law indemnity/contribution asserted by [Fletcher]" and Fletcher's counsel further stated at the oral argument that his "first and foremost argument is [a] cross-claim on contribution vicarious liability." (2/28/11 Tr. at 34; Fletcher's 56.1 ¶ 15; *see also* Royal's 56.1 ¶ 15.)

To the extent Fletcher intended to pursue an independent common law negligence cross-claim against Royal, the

court finds the so-called negligence cross-claim to be insufficiently pleaded on its face and devoid of any legal or factual support.  Indeed, at oral argument, Fletcher's counsel, unable to articulate a clear factual or legal bases supporting a negligence cross-claim against Royal, acknowledged that no facts supporting a direct negligence theory against Royal arose in discovery, that the claim was not "strong," that he had not briefed the issue, and he subsequently declined the opportunity to make further submissions to the court.  (*See* 2/28/11 Tr. at 34-35 (The court: "Is there a duty by rule . . . that you found in discovery and just neglected to bring to my attention?  Fletcher's counsel: "I don't believe there is, Your Honor, just by the rule book itself.  That's what I'm relying on.  The GPS, perhaps should have – just what — that's mentioned in the Rulebook and the GPS.").)  Thus, the court grants summary judgment as to any independent negligence cross-claim against Royal and considers Fletcher's second cross-claim to be one for contribution only.

## DISCUSSION

I. Legal Standards

A. New Jersey Substantive Law Applies

The parties do not dispute that the substantive law of the State of New Jersey applies to the conduct at issue in this action.  (*See* Royal's Mem. in Supp. at 6; Fletcher's Mem. in

Opp. at 6.)  Further, the court has determined that New Jersey law also applies to loss allocation.  (*See* ECF No. 69, Order Adopting Report and Recommendation; ECF No. 65, Report and Recommendation at 1.)

B. Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must show that there is no genuine, triable issue of material fact, and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  A fact is considered material if it "might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party carries the burden of demonstrating the absence of a genuine issue of material fact.  *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (citing *Celotex*, 477 U.S. at 323).  The moving party may discharge its initial burden by demonstrating that there is an absence of evidence to support the nonmoving party's case on an issue for which the nonmoving party bears the burden of proof at trial.  *Celotex*, 477 U.S. at 322-23.

The burden then shifts to the nonmoving party.  In order to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.  *Anderson*, 477 U.S. at 250.  To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor.  *Id.* at 249.  In demonstrating the existence of a genuine, triable issue of material fact, the non-moving party "may not rely on mere conclusory allegations [or] speculation." *Golden Pac. Bancorp. v. FDIC*, 375 F.3d 196, 200 (2d Cir. 2004) (citation omitted); *see also FDIC*, 607 F.3d at 292 ("To defeat a summary judgment motion, the non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." (citations omitted)).

In considering a motion for summary judgment, the court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in his favor. *Amnesty America v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2007) (citation omitted).

C. Vicarious Liability and the Doctrine of *Respondeat Superior*

Although personal fault is generally required for tort liability, "the doctrine of *respondeat superior* recognizes a vicarious liability principle pursuant to which a master will be

held liable in certain cases for the wrongful acts of his servants or employees." *Carter v. Reynolds*, 175 N.J. 402, 408 (2003); *see also Baldasarre v. Butler*, 132 N.J. 278, 291 (1992). The imposition of vicarious liability is determined by evaluating the relationship between the tortfeasor and the principal. *See generally Carter*, 175 N.J. at 409-10.

In order to hold a party vicariously liable for the torts of another, New Jersey courts first ask if the relationship is that of an employer-employee or a principal-independent contractor. *Carter*, 175 N.J. at 409. If the relationship is that of an employer-employee, then liability will be imposed on the employer if the employee was acting within the scope of his employment. *Id.* at 408-09. Liability for the torts of an employee is imposed on an employer because "one who expects to derive a benefit or advantage from an act performed on his behalf by another must answer for any injury that a third person may sustain from it." *Id.* at 408.

On the other hand, if the relationship is determined to be that of a principal-independent contractor, the court will only impute liability if the relationship falls within one of three exceptions, as described below. *Mavrikidis v. Petullo*, 153 N.J. 117, 133 (1997) (citing *Majestic Realty Assocs., Inc. v. Toti Contracting Co.*, 30 N.J. 425, 431 (1959)). This is because "one who hires an independent contractor 'has no right

of control over the manner in which the work is to be done,
[since the work] is to be regarded as the contractor's own
enterprise . . . .'" *Baldasarre*, 132 N.J. at 291 (quoting W.
Page Keeton et al., *Prosser and Keeton on the Law of Torts*, § 71
(5th Ed. 1984)); *see also Mavrikidis*, 153 N.J. at 134 ("[T]he
status of an independent contractor is characterized by the
attributes of self-employment and self-determination in the
economic and professional sense." (internal citations and
quotation marks omitted)).

1. Employer-Employee Relationship

The first step of the analysis is to determine the
nature of the relationship between the parties.  In order to
determine whether an employer-employee relationship exists, "the
language which the parties used in the contract [is not]
conclusive."  *Hannigan v. Goldfarb*, 53 N.J. Super. 190, 196
(N.J. Super. Ct. App. Div. 1958).  Rather, the court must look
at the level of control exercised or retained by the principal,
as well as "the totality of the facts surrounding the
relationship."  *Andryishyn v. Ballinger*, 61 N.J. Super. 386, 391
(N.J. Super. Ct. App. Div. 1960); *see also Drexel v. Union
Prescription*, 582 F.2d 781, 786 (3d Cir. 1978).

As described by the Supreme Court of New Jersey in
*Mavrikidis*, in determining whether a principal "maintains the
right of control," the court should look to the factors found in

section 220(2) of the *Restatement (Second) of Agency* (the

"factors" or "Restatement factors"), which include:

> (a) the extent of control which, by the
> agreement, the master may exercise over the
> details of the work;

> (b) whether or not the one employed is engaged in
> a distinct occupation or business;

> . . .

> (d) the skill required in the particular
> occupation;

> (e) whether the employer or the workman supplies
> the instrumentalities, tools, and the place of
> work for the person doing the work;

> (f) the length of time for which the person is
> employed;

> (g) the method of payment, whether by the time or
> by the job;

> (h) whether or not the work is a part of the
> regular business of the employer; [and]

> (i) whether or not the parties believe they are
> creating the relation of master and servant . . .

*Mavrikidis*, 153 N.J. at 132 (quoting *Restatement (Second) of

Agency* § 220(2) (1958)).[11]  Whether an employer-employee

---

[11] New Jersey courts employ an additional test when evaluating *respondeat
superior* liability in the worker's compensation context that is not generally
applicable in the tort context.  In the worker's compensation context, courts
utilize both a control test and a "nature of the work" test, the latter of
which focuses on the worker-plaintiff's economic dependence on the principal
and on the relationship between the worker-plaintiff's and principal's work.
*See, e.g.*, *Sloan v. Luyando*, 305 N.J. Super 140, 148 (N.J. Super. Ct. App.
Div. 1997).  Because of the remedial policy behind the Workers' Compensation
Act, courts broadly construe the term "employee" within that statute to
"bring as many cases as possible within the scope of the Workers'
Compensation Act . . . ."  *Id.* at 147; *see also Aetna Ins. Co. v. Trans Am.
Trucking Serv.*, Inc., 261 N.J. Super. 316, 326 (N.J. Super. Ct. App. Div.

relationship exists should be determined by taking all of these and other relevant factors into account and assessing the totality of the circumstances.[12]  *See, e.g.*, *Andryishyn*, 61 N.J. Super. at 391; *Dee* v. *Excel Wood Products Co.*, 86 N.J. Super. 453, 458-59 (N.J. Super. Ct. App. Div. 1965) ("Whether or not a person was an employee must be determined upon the totality of the facts surrounding the relationship." (internal citation and quotation marks omitted)).

        If, after applying these factors, the court finds that an employer-employee relationship exists between the parties, the court next determines whether the employee was acting within the scope of his or her employment.  *Carter*, 175 N.J. at 408-10 (2003).  If, however, the court finds that a principal-independent contractor relationship exists instead, the court must then determine whether the relationship falls within one of the three exceptions to the general rule that a principal is not

---

1993).  As the parties cite to a number of cases appearing in the worker's compensation context, the court considers them, but notes where the different policy concerns, not present in the instant case, drive the outcomes of those decisions, and distinguishes them accordingly.

[12] While a simplified control test used to be determinative of an employee relationship, *see Courtinard v. Gray Burial and Cremation*, 98 N.J.L. 493 (1923), the New Jersey courts have moved to a broader view of determining when an "employment" relationship exists, although control is "usually considered the principal one."  *Andryishyn*, 61 N.J. Super. at 391 ("The relationship of master and servant is not capable of exact definition. [*Restatement (Second) of Agency* section 220(2)] lists various factors that may be considered in determining whether one who acts for another is a servant or an independent contractor.  Control is only one of them, albeit usually considered the principal one. . . . [Whether an employment relationship exists] must be determined in light of the totality of the facts surrounding the relationship.").

liable for the torts of an independent contractor.  *Mavrikidis*,
153 N.J. at 133.

### 2. Exceptions to a Principal's Immunity from Liability for an Independent Contractor's Torts

New Jersey law recognizes three exceptions that would
cause a principal to lose immunity from liability for the torts
of an independent contractor.  The exceptions are if the
principal: "(a) . . . retains control of the manner and means of
the doing of the work which is the subject of the contract;
(b) . . . he engages an incompetent contractor; or (c) . . . the
activity contracted for constitutes a nuisance *per se*."
*Mavrikidis*, 153 N.J. at 133 (citing *Majestic*, 30 N.J. at 431).
The second and third exceptions are inapplicable here.[13]

Under the first exception, the principal may face
liability for his independent contractor's torts if he
"reserve[s] [] control 'of the manner and means' of the
contracted work . . . ."  *Id.* at 134 (internal citation
omitted).  The reservation of control may be expressed "over the
equipment to be used, the manner or method of doing the work, or
direction of the employees of the independent contractor . . .
."  *Id*. at 135.

---

[13] Royal argues, and the court agrees, that neither the incompetent contractor
nor the nuisance *per se* exceptions are applicable here.  (Royal's Mem. in
Supp. at 7.)  Fletcher does not address whether these exceptions apply.  (*See
generally* Fletcher's Mem in Opp.)  The court accordingly focuses its analysis
on the retention of control exception.

While control is a key element for imposing vicarious liability on a principal, "supervisory acts performed by the [principal] will not give rise to vicarious liability . . . [because] application of principles of *respondeat superior* are not warranted where the [principal]'s supervisory interest relates [only] to the result to be accomplished, not to the means of accomplishing it." *Id.* (internal citations and quotation marks omitted).

The court notes that the New Jersey courts look to similar factors and apply a similar analysis when determining whether an employer-employee relationship exists as when determining whether the control exception applies to a principal-independent contractor relationship. In both analyses, the court's primary focus is on the retention of control by the alleged employer-principal and whether the alleged employer/principal exceeded its general supervisory functions. In the employer-employee relationship, the analysis focuses on the retention of control *by agreement* and, in the principal-independent contractor relationship, the focus is on the level of control in the day-to-day relationship, in addition to the retention of control by agreement. It appears to this court that, once the New Jersey courts determine that an independent contractor relationship exists, there is a lower threshold for the level of control exercised by the principal in

order to find that the exception to principal immunity applies.
*See, e.g.*, *id.* at 132-36.

### D. Contribution/Indemnification

The concepts of contribution and indemnification are often confused. Contribution is the obligation of each joint tortfeasor to pay his or her share of damages as determined by the court, whereas indemnification is the obligation of one party to fully reimburse another for any liability assigned to the party requesting indemnification for damages to the injured party. *See, e.g.*, *Ruvolo v. United States Steel*, 133 N.J. Super. 362, 366 (N.J. Super. Ct. Law Div. 1975). Indemnity is proper when there is a special legal relationship between the indemnifier and the indemnified, which can be express or implied. *See id.*

Generally, New Jersey law does not recognize indemnity between joint tortfeasors.[14] *See, e.g.*, *Blazovic v. Anderich*, 124 N.J. 90, 96, 110 (1991); *Ruvolo*, 133 N.J. Super. at 367; *Public Service Elec. and Gas Co. v. Waldroup*, 38 N.J. Super. 419, 431-32 (N.J. Super. Ct. App. Div. 1955) (finding that indemnity should not apply in cases of "concurrent or joint

---

[14] One exception to this general rule, which is not applicable here, is that "a third party may recover on a theory of implied indemnity from an employer only when a special legal relationship exists between the employer and the third party, and the liability of the third party is vicarious." *Ramos v. Browning Ferris Indus. of S. Jersey*, 103 N.J. 177, 188-89 (1986). As discussed herein, here, Fletcher does not allege or argue, and there is no evidence in the record to suggest, that any special relationship between Fletcher and Royal existed to create a claim of implied indemnity.

tortfeasors, having no legal relation to one another, each of them owing the same duty to the injured party."). However, New Jersey law allows joint-tortfeasors to receive contribution from each other.[15] *Blazovic*, 124 N.J. at 105; *Ruvolo*, 133 N.J. Super. at 366.

Where an employer (or a principal who falls within one of the exceptions creating liability for the actions of an independent contractor) is a party to the action and is found to be vicariously liable for a plaintiff's injuries,[16] the employer may be sued for contribution by a joint tortfeasor. *See* Joint Tortfeasor Contribution Act, N.J. Stat. §§ 2A:53A-1 to -3 (2011) ("For the purpose of this act the term 'joint tortfeasors' means two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them. *A master and servant or principal and agent shall be considered a single tortfeasor*." (emphasis added)).

Notably, an employer (or a principal who falls within one of the exceptions creating liability for the actions of an independent contractor) may be considered a "party" and liable

---

[15] A plaintiff may only recover the full amount of damages from a party found to be more than 60% responsible for the damages. N.J. Stat. Ann. § 2A:15-5.3(a) (2011). Further, a party may only seek contribution if he or she is compelled to pay more than his or her share based on apportionment of fault. N.J. Stat. Ann. § 2A:15-5.3 (2011).

[16] An employer may not be found liable for a plaintiff's injuries if the employer is not considered a joint tortfeasor, which will happen if the employer is sued by an employee and the relationship is governed by Workers' Compensation. *See Ramos*, 103 N.J. at 190.

for contribution even where, as here, the plaintiff has not asserted, or is barred from asserting, a claim over the employer. *See Cooper v. Phila. Dairy Prods.*, 34 N.J. Super. 301, 304 (1955). This is because "the cause of action owned by the plaintiff is distinct from the cause of action arising out of the duty of additional defendant to indemnify [or contribute to] the defendant." *Id.* (allowing a third-party defendant to be joined even though the statute of limitations barred any claim by the plaintiff against the third-party); *see also Wilcheck v. Chaney*, 163 F. Supp. 199, 199 (D.N.J. 1958) (plaintiff-railroad conductor sued tractor-trailer driver for injuries sustained in a collision, but not railroad-employer; defendant filed a third-party complaint for contribution against the railroad, which the court considered to be a joint tortfeasor). Accordingly, the fact that the plaintiffs and Kaykov have dismissed their respective claims against Royal does not, in and of itself, preclude Fletcher seeking contribution and/or indemnification from Royal in the event Royal is found to be vicariously liable for Kaykov's acts.

    II.    The Parties' Arguments

        In support of its motion for summary judgment, Royal conclusorily states that it cannot be vicariously liable for Kaykov's torts because Royal is not Kaykov's employer. (Royal's Mem. in Supp. at 4.) Royal then argues that the relationship

between Kaykov and Royal does not fall within the retention of control exception for holding a principal vicariously liable for the torts of an independent contractor because there is no evidence to support a finding that Royal exercised or retained the authority to exercise control over the means and manner of Kaykov's work. (*Id.* at 8.)

In support of its arguments, Royal cites to the following undisputed facts, supported by sections of the Franchise Agreement and the depositions of Oberlander and Kaykov: that the Franchise Agreement is not exclusive, franchisees own their vehicles and navigation systems, maintain their own vehicles, insurance policies and licenses, are free to accept or decline jobs, and receive 1099 tax forms.[17] (*Id.* at 10.) Further, Royal maintains that, because the Rulebook is created, maintained, and enforced by the franchisees, and exists solely for the benefit of the franchisees, it "is in no way indicative of supervision, direction and/or control exercised or retained by Royal," and that any argument to the contrary "is simply a red herring." (*Id.* at 5, 11; Royal's 56.1 ¶ 5; 2/28/11 Tr. at 6.)

---

[17] Royal relies on what it ultimately conceded at oral argument were disputed issues of fact: whether drivers are required to work any particular shift, that Royal provides training or directions beyond pick-up and drop-off location to its franchisees, and whether Royal has any part in inspecting the franchisees' vehicles. (*See* Royal's Mem. in Supp. at 10; 2/28/11 Tr. at 7-16.) Because Fletcher has come forward with admissible evidence disputing these facts, the court must consider whether these disputed facts are material in determining whether summary judgment is appropriate.

In opposition, Fletcher argues that there are questions of fact as to whether Royal is Kaykov's employer, and, even if Royal is not Kaykov's employer, that questions of fact remain as to whether Royal exercised or retained sufficient control over Kaykov's day-to-day job performance for Royal to fall within the exception to immunity from liability for the torts of an independent contractor. (Fletcher's Mem. in Opp. at 5; 2/28/11 Tr. at 28.)

Fletcher's argument relies most heavily upon the indicia of control found in the Rulebook, such as the dress, demeanor, inspections, and shift requirements, as well as the "comprehensive judicial and penal systems" the Rulebook puts in place to enforce the rules contained in the Rulebook. (*See id.* at 8-12.) Fletcher points to evidence that Royal may have created the Rulebook, and ultimately asserts that, by making adherence to the Rulebook a condition of the Franchise Agreement and failure to do a basis for termination of the Franchise Agreement, Royal "maintained the right to, and actually did, exercise control over how [Kaykov] operated his franchise on a daily basis." (*Id.* at 8.) Fletcher also points to alleged elements of control contained in the Franchise Agreement itself, such as that the requirements that the franchisees must drive a certain make and model of car; must attend training by Royal on the computer system and may be compelled by Royal to attend

further training sessions; receive payment from Royal, subject to Royal's commission; must undergo regular testing for drugs, alcohol and other controlled substances; and franchisees' insurance policies must name Royal as the party to be notified in the case of cancellation. (*See* Fletcher's Mem. in Opp. at 8-12.)

  III.   Analysis

As required, when considering a motion for summary judgment, the court will construe all facts in the light most favorable to the non-moving party, Fletcher, and will resolve all reasonable inferences and ambiguities against the moving party, Royal. *See Flanigan v. General Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001).

Before commencing this analysis, the court notes that commentators have expressed concern that the traditional employee-independent contractor and independent contractor exception analytical framework employed by New Jersey courts (as well as many other jurisdictions) to determine whether a principal should be held vicariously liable for the torts of another, is not well suited for franchisee-franchisor relationships. *See* John Hanks, *Franchisor Liability for the Torts of Its Franchisees: The Case for Substituting Liability as a Guarantor for the Current Vicarious Liability*, 24 Okla. City U.L. Rev. 1, 3 (1999) ("[T]he franchisor-franchisee relationship

is neither that of an employer-employee . . . nor of an employer and independent contractor . . . [i]t is not surprising then that judicial attempts to apply the employee-independent contractor dichotomy in the franchising context often appear arbitrary."); *see also* Deanna Conn, *When Contract Should Preempt Tort Remedies: Limits on Vicarious Liability for Acts of Independent Contractors*, 15 FORDHAM J. CORP. & FIN. L. 179, 214 (2009) ("The current law of vicarious liability is inconsistent in the franchise area."); King, *Limiting the Vicarious Liability of Franchisors for the Torts of Their Franchisees*, 62 WASH. & LEE L. REV. 417, 468-69 (2005) (noting that a franchisor is often "caught in a quandary, trying to protect the goodwill and reputation of his trademark while at the same time avoiding so much control or appearance of control [of franchisees] that it is deemed to have crossed the actual or apparent agency line" for purposes of vicarious liability).

In the absence of a clear alternative legal framework, this court will rely on the employee-independent contractor analysis and independent contractor exception analysis employed by New Jersey courts to determine whether Royal can be found vicariously liable for the torts of Kaykov. The court is mindful that these tests do not fit squarely in the franchise context.

## A. Employee or Independent Contractor Status

The first inquiry is whether there are disputed issues of material fact that preclude summary judgment as to whether Royal acted as Kaykov's employer. As noted, New Jersey courts look to the factors set forth in the Restatement of Agency as a guide to determine whether an employer-employee relationship exists, and no factor alone is dispositive. *Mavrikidis*, 153 N.J. at 132 (citing *Restatement (Second) of Agency* § 220(2)). Thus, the court will examine the evidence in the record relevant to each of the factors in turn.

The court notes that neither party explicitly addresses all of the Restatement factors in their papers; Royal conclusorily states that Kaykov is an independent contractor without specifically analyzing how the Restatement factors lead to this conclusion and Fletcher focuses solely on the first Restatement factor, the retention of control by agreement, mistakenly presuming this factor to be determinative of an employer-employee relationship. As this court must evaluate Royal's and Kakov's relationship in light of the totality of the circumstances, *Andryishyn*, 61 N.J. Super. at 391, where the court finds the facts or cases cited by either party in support of their respective positions are applicable at other points in the analysis, the court considers them as well.

1. Extent and Retention of Control by Agreement

The court turns first to the issue of "the extent of control which, by the agreement, the master may exercise over the details of the work." *Mavrikidis*, 153 N.J. at 132 (citing *Restatement (Second) of Agency* § 220(2)). The more control retained by the principal in the agreement between the parties, the more likely courts are to find that an employer-employee relationship has been created. The focus of this factor is on the agreement between the parties and the *right* to control retained by the principal, not necessarily the degree of control actually exercised. *Sloan*, 305 N.J. Super. at 148.

A principal can retain control through specific provisions in an agreement, or by granting the principal broad discretionary authority within an agreement. *See Hannigan*, 53 N.J. Super. at 201 (noting that, in some cases, a showing of control may be made through introduction of detailed regulations); *see also Drexel*, 582 F.2d at 789 (applying Pennsylvania law, which, like New Jersey, adopts the Restatement of Agency and finding that the franchise agreement at issue in that case included provisions "so nebulously and generally phrased as to suggest that [the franchisor] retained a broad discretionary power to impose upon the franchisee virtually any control, restriction, or regulation it deemed appropriate or warranted").

Notably, while the language of the applicable agreement provides evidence of the control or lack of control in the relationship, it is not dispositive of the relationship. *See, e.g.*, *Drexel*, 582 F.2d at 786 (applying Pennsylvania law, which, like New Jersey, adopts the Restatement of Agency, and finding that "[t]he fact that the franchise agreement expressly denies the existence of an agency relationship is not in itself determinative of the matter"); *see also Hannigan*, 53 N.J. Super. at 195-96 (finding that, when inquiring whether parties are employer and employee, courts are more concerned with the facts surrounding the relationship than the formal wording of a contract).

a. The Rulebook

Foremost, the court finds that there are issues of material fact as to whether Royal creates and enforces the Rulebook, the resolution of which is necessary to determine the extent to which Royal actually exercised or retained control over Kaykov by agreement. While, on one hand, the Franchise Agreement specifically states that the franchisee "shall at all times be free from the control or direction of the franchisor in the operation of franchisee's vehicle," it also conditions the supervision and direction of the franchisee upon adherence to the "*Franchisor's* rulebook." (Ex. O, Franchise Agreement ¶ 41 (emphasis added); *see also* Royal's 56.1 ¶ 5; Fletcher's 56.1

¶ 5.)  The Franchise Agreement further requires franchisees "to abide by all the rules and regulations presently set forth in the Rulebook developed, implemented[,] and enforced by the Franchisees' Committees" (Ex. O, Franchise Agreement ¶ 18), and makes failure to do so a material breach of the Franchise Agreement.  (*Id.* ¶ 35(a)(i)).

Although Royal maintains that there is no evidence that Royal retained or exercised control via the Rulebook, as noted above, the plain language of the Franchise Agreement makes adherence to the Rulebook a condition of the Franchise Agreement and failure to do so a basis for termination of the franchise relationship.  Thus, the Franchise Agreement's explicit incorporation of the Rulebook by reference, in and of itself, raises issues of fact as to whether Royal controls the details of the franchisees' work by and through the Rulebook and supplies evidence upon which a jury could find that Royal retained and/or exercised control over Kaykov.

Royal's proffered explanation that the Franchise Agreement only contains references to the Rulebook so that the franchisees, via the Franchisees' Committee, have a mechanism by which to create and enforce strict standards of conduct for drivers does not dispel the disputed issues of material fact surrounding the Rulebook's creation and enforcement.  Despite Royal's insistence that the Rulebook is created and enforced

solely for the benefit of the franchisees, it is equally true that enforcing strict standards of conduct for drivers in order to maintain the goodwill and reputation of a first-rate car service redounds to Royal's benefit. (*See* 2/28/11 Tr. at 6, 10.) Thus, given that the Franchise Agreement mandates that franchisees follow the Rulebook, the question of whether the Rulebook is promulgated and enforced by an independent Franchisees' Committee or by a Franchisees' Committee that is actually controlled by Royal, remains a disputed issue of material fact.[18] As will be discussed below, this conclusion is only compounded by Royal counsel's inability in his submissions and at the oral argument to offer any evidence showing a separation between Royal and the Franchisees' Committee, such as where the Rulebook was written, where the Franchisees' Committee sits, holds meetings, keeps minutes, how complaints about drivers are received and handled as between Royal and the Franchisees' Committee and where the franchisee disciplinary actions take place. (*See* 2/28/11 Tr. at 5, 15-17, 22.)

Royal next argues that, even assuming that it had the authority to enforce the Rulebook, that power is only "akin to basic supervisory power, not the power to control the actual

---

[18] Indeed, it is evident that Royal endorsed, supported, or even created a "self-governing" Franchisees' Committee system in order to protect itself from being held liable for the torts of its franchisees, while at the same time, benefiting from the control exerted over its franchisees by the Franchisees' Committee that operates under Royal's auspices.

means and methods utilized by the franchise[e]s in carrying out their subcontracted work."  (ECF No. 84, Royal's Reply at ¶ 7.) This argument is unpersuasive.  The Rulebook explicitly sets forth detailed rules governing the drivers' attire, conduct, handling of customers and their luggage, attitude toward passengers and other drivers, vehicle inspections, and shift requirements, and allows for spot inspections to ensure compliance with the rules, and a comprehensive adjudication system to evaluate and punish transgressors.  (*See, e.g.*, Ex. Q, Rulebook at 2, 4, 8B, 10, 12m, 23-26.)  The court finds that the power to create and/or enforce rules governing such intricate details of the day-to-day means and methods of the franchisees' work far exceeds general supervisory powers that merely seek uniformity and standardization of services among franchisees.

Finally, Royal makes much of the fact that, in practice, Royal does not regularly enforce the provisions of the Rulebook and that, despite what is written in the Rulebook and in the Franchise Agreement, vehicle operators are in total control of their day-to-day business operations.  (*See, e.g.*, 2/28/11 Tr. at 8-10 (conceding that the Rulebook requires drivers to work between 4 A.M. and 9 A.M. at least one day per week, but generally referencing deposition testimony indicating that the provision is not enforced in practice); *see also* Royal's Mem. in Supp. at 10.)  As noted, the instant Restatement

42

factor is concerned with whether Royal maintained the right to control its franchisees *by agreement*, and not whether Royal actually exercised that right. Accordingly, the court will address Royal's argument that is does not exercise control over the operation of the franchisees as provided in the Rulebook and the Franchise Agreement, and the questions of fact it raises, *infra*, within the control exception section, which is concerned with both the right to control retained by agreement and the control actually exercised on a day-to-day basis by the principal.

b. The Franchise Agreement

To the extent Royal argues that the language of the Franchise Agreement stating that franchisees "shall at all times be free from the control or direction of the franchisor in the operation of franchisee's vehicle," is sufficient to dispel any question of fact as to whether Royal controlled Kaykov, the court notes that this language is not dispositive, especially when considering the Franchise Agreement as a whole. *See Dee*, 86 N.J. Super. at 458.

Moreover, the court finds that the language of the Franchise Agreement itself could be interpreted to provide that Royal retained broad and general control over Kaykov by agreement. For example, on its own terms, the Franchise Agreement includes a list of material breaches that, if

committed by the franchisee, would give Royal the right to terminate the Franchise Agreement and further contains broad discretionary authority for Royal to terminate the agreement for cause "due to breach by Franchisee of any other term or condition of this Agreement." (Ex. O, Franchise Agreement ¶ 35(a) (listing the enumerated material breaches, which include the "failure to maintain Franchisee's vehicle in excellent condition and offer professional courteous and efficient service").) The breadth and discretion Royal retains under the Franchise Agreement in determining what constitutes a material breach of the contract suggests at least minimal retention of control. (Royal's 56.1 ¶ 5; Ex. Q, Rulebook; Ex. Y, Oberlander Dep. at 24, 25, 29-30, 34; Fletcher's 56.1 ¶ 5; Ex. O, Franchise Agreement ¶ 35(a); Ex. V, Kaykov's 1/8/09 Dep. at 159, 162.)

Finally, Fletcher points to undisputed facts contained in the Franchise Agreement, which it argues supports a finding that Royal was Kaykov's employer, such as that the Franchise Agreement requires the franchisees to own a certain make and model of car, to maintain insurance with Royal listed as the party to be notified in the event of cancellation, and to undergo drug and alcohol testing. The court finds, however, that, with the exception of the make and model of the vehicle, these requirements are the types of arrangements endemic to the proper, legal, and safe administration of a franchise, and

without more, these undisputed facts do not suggest that Royal retained or exercised more than general supervisory authority over its franchisees.

Accordingly, considering the disputed facts contained in the Rulebook and Franchise Agreement in the light most favorable to Fletcher, this Restatement factor tips in favor of finding an employer-employee relationship, however, as discussed below, the totality of the circumstances indicate that the relationship is that of principal-independent contractor.

2. Distinct Occupation and Regular Business

In order to determine whether an employer-employee relationship exists, courts consider "whether or not the one employed is engaged in a distinct occupation or business," and "whether or not the work is a part of the regular business of the employer." *Mavrikidis*, 153 N.J. at 132.  If the business of the employer is essentially the same as that of the independent contractor, or if the reliance on the independent contractor is part of the regular operation of the business, then the relationship is more likely to be defined as that of employer-employee.  If, however, the business is different from the occupation of the individual, or the individual's work is not part of the regular business of the company, then the relationship is more likely one of an independent contractor. *See Hannigan*, 53 N.J. Super. at 201.

In this case, Royal is a vehicle-for-hire dispatcher that advertises its dispatching services and connects the franchisees it has contracted with to its customers. Like other franchisees, Kaykov is the owner and operator of a vehicle who may accept or reject any call dispatched by Royal, may employ his own drivers to operate his cars as a part of his franchise, and may contract with other franchisors and/or private clients. Although the functioning of the dispatch service ultimately relies on the availability of drivers to be dispatched, each franchisee is engaged in a separate business of driving his or her own vehicle, which is owned, insured and maintained by the franchisee. (*See* Royal's 56.1 ¶¶ 7, 9; Fletcher's 56.1 ¶¶ 7, 9; Ex. Y, Oberlander Dep. at 6-8, 15, 22, 47; Ex. O, Franchise Agreement ¶¶ 1, 7, 10, 11.) Thus, the undisputed facts suggest that Royal is in the regular business of dispatching and that Kaykov was engaged in a distinct, but inter-related, occupation. *Cf. Hannigan*, 53 N.J. Super. at 194-96, 207 (because of the policy reasons behind the New Jersey's workers' compensation law, the court broadly interpreted the definition of employee and found that company, which leased cabs, painted the same color with the same insignia, to drivers at a daily rate, was in the business of running a cab company instead of in the business of leasing cabs to independent contractors).

On the other hand, it appears that Kaykov's activity was an integral part of Royal's overall business model. Unlike hiring a painter for a one-time job, the reliance on the franchisees to pick up and drive passengers was central to Royal's operation. Overall, this factor tips towards finding an independent contractor relationship. *See, e.g.*, *Geary v. Simon Dairy*, 7 N.J. Super. 88, 90 (N.J. Super. Ct. App. Div. 1950) (finding an independent contractor relationship even though the truck driver regularly transported the shippers' goods).

3. Expertise of the Individual

Courts also look to the "skill required in the particular occupation" in order to determine whether an employer-employee relationship exists. *Mavrikidis*, 153 N.J. at 132. The expertise needed for the job is probative of such a relationship because an independent contractor is often hired for his or her expertise or ability to complete a job that the principal does not have the know-how to do him or herself. *See, e.g.*, *Dee*, 86 N.J. Super. at 456.

Here, Kaykov, like the other franchisees, maintained his own driver's and New York City Taxi and Limousine licenses, operated his motor vehicle, and navigated between points of pick-up and delivery. (Royal's 56.1 ¶ 8; Fletcher's 56.1 ¶ 8; Ex. J, Department of Motor Vehicles Registration; Ex. L, New York City Taxi and Limousine License.) Although operating a

vehicle and navigating it from point to point may not be considered a highly skilled trade, the skill set is certainly different from that of a dispatcher, and Royal relied on Kaykov's ability to operate his car, navigate to destinations, and maintain his licenses.

Fletcher points to evidence demonstrating that Kaykov could access route assistance by pushing a button on the computer system installed in his car by Royal; however, there was no requirement that Kaykov actually follow a specific route, once provided by the computer system. Indeed, Kaykov was required to own his GPS and Royal points to admissible evidence that Kaykov navigated without any assistance from the computer system based on his personal experience, including on the day of the accident. (Ex. U, Kaykov 12/5/08 Dep. at 29-30; *see also* 2/28/11 Tr. at 25.) Thus, the fact that Royal installed a computer system capable of providing route assistance, if requested, is not sufficient to suggest an employer-employee relationship. *Courtinard*, 98 N.J.L. at 494 (holding that the relationship was not that of employer-employee when the driver was only given the destination and not instructed as to how to get there); *see also Lacombe v. Cudahy Packing*, 103 N.J.L. 651, 654 (1927) (finding that even though the driver was given more directions than in *Courtinard*, the relationship was still not that of master-servant). Accordingly, Kaykov has a distinct

skill, relied on by the principal, which is characteristic of an independent contractor.

### 4. Instrumentalities and Tools for the Job

Courts further consider "whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work" when determining whether an employer-employee relationship exists. *Mavrikidis*, 153 N.J. at 132. The more instrumentalities and tools that belong to and are supplied by the employer, the more likely the individual at issue will be considered an employee. *See, e.g.*, *Hannigan*, 53 N.J. Super. at 197. The more tools that an individual provides or owns himself, the more likely he will be considered an independent contractor. *See, e.g.*, Geary, 7 N.J. Super. at 90-91.

Royal argues that undisputed facts here suggest that Kaykov predominately owns and supplies his own tools and instrumentalities. (Royal's Mem. in Supp. at 4.) For example, Royal notes that Kaykov owns his own vehicle and navigation equipment, and maintains his own New York City Taxi and Limousine, New York State Driver's licenses, and insurance. (Royal's 56.1 ¶ 8; Fletcher's 56.1 ¶ 8; Ex. J, Department of Motor Vehicles Registration; Ex. K, Automobile Insurance Card; Ex. L, New York City Taxi and

Limousine License; Ex. O, Franchise Agreement ¶¶ 7, 10, 11.)  Further, Royal points to undisputed evidence that Kaykov is responsible for servicing his vehicle and repairing or replacing the vehicle if it breaks down or is otherwise damaged at the service stations of his choice. (Ex. O, Franchise Agreement ¶¶ 8, 9.)  Although, as Fletcher points out, Kaykov leases the computer dispatch system necessary to receive dispatch calls from Royal, and displays a company magnetic sign with his car number on his vehicle while he is working on a Royal job, the undisputed facts demonstrate that Kaykov owns and supplies all of the other items necessary for the job, such as his licenses, insurance, the vehicle itself, and the GPS.  Thus, the court finds that "tools and instrumentalities" factor tips in favor of finding that an independent contractor relationship existed.  *See, e.g.*, *Geary*, 7 N.J. Super. at 90 (finding an independent contractor relationship existed where the truck at issue was owned and maintained by the hauler/contractee, despite the fact that the company name was painted on the side); *cf. Hannigan*, 53 N.J. Super. at 197 (finding employment relationship existed where taxicabs, which were all the same color, painted with the same logo, and only leased to, but not owned by, the

drivers led the public to believe that the drivers were

employees or part of the larger company).

     5. Duration of Employment

     The duration of the relationship, or the "the length

of time for which the person is employed" is also considered.

*Mavrikidis*, 153 N.J. at 132. Where the term is longer or not

job-based, but rather indefinite and ongoing, courts tend to

find that an employer-employee relationship exists. *See*

*Andryishyn*, 61 N.J. Super. at 392. Where, however, the term is

shorter or job-by-job, courts are more likely to find the

existence of an independent contractor relationship. *Id.*

Although an independent contractor may enter into a long-term

contract, generally an independent contractor is hired for a

shorter-term portion of a larger job. *Id.* (considering both the

term of the agreement and the length of the jobs performed).

     In this case, at the time of the accident, Kaykov had

owned his franchise with Royal for approximately seven years,

from April 2000 to July 2007. (Royal's 56.1 ¶ 4; Ex. O,

Franchise Agreement.) Nonetheless, the term of Kaykov's "jobs"

with Royal is the length of each job assigned to and completed

by Kaykov, which could range from a short trip of a few blocks

to a ride from New York City to Pennsylvania. While the term of

the Franchise Agreement was indefinite, each job was separately

contracted, suggesting the existence of an independent

contractor relationship. *J.M.L. v. A.M.P.*, 379 N.J. Super. 142, 151-53 (N.J. Super. Ct. App. Div. 2005) (finding that the franchisor of a karate studio chain was not an employer despite an indefinite contract term); *see also Andryishyn*, 61 N.J. Super. at 392 (affirming denial of summary judgment on whether an employer relationship existed and finding that the trial court had properly considered, *inter alia*, that the alleged employee worked on a job-by-job basis but had been employed for a four-year term).

6. Method of Payment

Courts will also look to "the method of payment, whether by the time or by the job" to determine if an employer relationship exists. *Mavrikidis*, 153 N.J. at 132. When an individual is paid by the job or receives a 1099 tax form,[19] he or she is more likely to be considered an independent contractor. *Arthur v. St. Peters Hospital*, 169 N.J. Super. 575, 578 (N.J. Super. Ct. Law Div. 1979). On the other hand, when an individual receives an annual or hourly salary and is subject to employer-withholdings, then the individual is more likely to be considered an employee because receipt of a salary or hourly-wage creates a

---

[19] This is the tax form used for independent contractors and does not include any withholdings found on a W-2, which is the form used for employees. *See, e.g.*, "Instructions for Form 1099-MISC" at 3, *available at* www.irs.gov/pub/irs-pdf/i1099msc.pdf ("Generally, you must report payments to independent contractors on Form 1099-MISC in box 7."); "2011 Instructions for Forms W-2 and W-3" at 2, *available at* www.irs.gov/pub/irs-pdf/iw2w3.pdf ("Every employer. . . who pays remuneration for services performed by an employee [should use a W-2]."

strong economic reliance on the employer and reduces the employee's autonomy. *See Sloan*, 305 N.J. Super. at 149 (finding that the driver was an employee because, in the workers' compensation context, the element of economic dependence is particularly relevant to the legislative intent).

The undisputed facts in this case indicate that Royal does not pay Kaykov an hourly or annual salary. Instead, Kaykov is paid on a job-by-job basis, as follows. After Kaykov drives a client from one location to another, the client provides Kaykov with a voucher. (Royal's 56.1 ¶ 6; Fletcher's 56.1 ¶ 6; Ex. Y, Oberlander Dep. at 8-13; Ex. U, Kaykov's 12/5/08 Dep. at 22-24.) Kaykov turns that voucher over to Royal and Royal then collects the fares from companies who have accounts with Royal. (Royal's 56.1 ¶ 6; Fletcher's 56.1 ¶ 6; Ex. Y, Oberlander Dep. at 11-13; Ex. U, Kaykov's 12/5/08 Dep. at 22-24.) Royal withholds a commission from the collected fare for each job Royal dispatches to Kaykov. (Royal's 56.1 ¶ 6; Fletcher's 56.1 ¶ 6; Ex. Y, Oberlander Dep. at 8-13; Ex. U, Kaykov's 12/5/08 Dep. at 22-24.) The amount of the commission withheld depends on how quickly Kaykov indicates he would like to receive payment. (Royal's 56.1 ¶ 6; Fletcher's 56.1 ¶ 6; Ex. Y, Oberlander Dep. at 8-13; Ex. U, Kaykov's 12/5/08 Dep. at 22-24.) Thus, the exchange of pay between Kaykov and Royal is done on a job-by-job basis; if Kaykov does not drive clients, he is not paid. The fact that Royal, and

not Kaykov, collects the money from the client and then disburses that payment to the franchisee, after deducting the requisite commission, does not change the fact that Kaykov is paid on a job-by-job basis.  This arrangement suggests the existence of an independent contractor relationship, notwithstanding Royal's control of payment to its franchisee drivers.  *Cappadonna v. Passaic Motors*, 136 N.J.L. 299, 300 (1947) (in worker's compensation case, finding an independent contractor relationship even though the alleged employee was paid by the day, since he was not on the payroll and no social security or unemployment deductions were made, and procured his own materials), *aff'd* 137 N.J.L. 661 (1948); *Am. Carrier Corp. v. Avigiano*, 123 N.J.L. 490, 491 (1939) (in worker's compensation case, truck driver found to be an employee when he was paid a salary and employer prescribed the driver's route); *see also Dee*, 86 N.J. Super. at 457-58 (in worker's compensation case, finding that the totality of the circumstances established the existence of an independent contractor relationship even though social security and withholding taxes were made from the alleged employee's pay, and employee was paid an hourly rate).

Furthermore, it is also undisputed that Royal provided Kaykov with a 1099 tax form each year, which reflects the total disbursements made by Royal to Kaykov and that Royal makes no deductions or withholdings for unemployment, taxes, or social

security.  (Royal's Mem. in Supp. at 1; Royal's 56.1 ¶ 6; Ex. M,

Kaykov's 2007 1099 Tax Form.)  As other New Jersey courts have

found, the fact that Royal makes no deductions or withholdings

for unemployment, social security, or taxes from the alleged

employee's paychecks is probative, although not dispositive, of

an independent contractor relationship.[20]  *Arthur*, 169 N.J. Super.

at 578 ("[I]t is clear that while the absence of deductions may

have some probative value on the issue of whether an employer-

employee status existed, 'neither the making nor the failure to

make such deductions is dispositive of an issue of this type.'"

(quoting *Dee*, 86 N.J. Super. at 457)).  Thus, the fact that

Kaykov was paid on a job-by-job basis, received a 1099 tax form,

and that Royal made no tax withholdings strongly favor the

existence of an independent contractor relationship.

      7. Understanding of the Parties

      Another important factor courts consider is the

understanding between the parties, specifically, "whether or not

---

[20] Fletcher cites to the unreported case, *Same Day Exp., Inc. v. New Jersey Dep't of Labor and Workforce*, 2007 WL 1627310 (N.J. Super. Ct. App. Div. June 17, 2007), in support of the proposition that a worker's receipt of 1099 does not preclude submission of the facts to a jury on the employment relationship.  (*See* Fletcher's Opp. at 8.) The court notes that New Jersey Court Rules do not allow courts to rely on unpublished decisions.  *See* 1 N.J. Prac., Court Rules Ann. R. 1:36-3 (2010 supp.).  Furthermore, even if the court were permitted to rely on the decision, the court's findings in that case, which dealt with unemployment compensation contributions and temporary disability insurance benefits under a completely separate statutory scheme, N.J.S.A. 43:21, cut against a finding of an employment relationship.  *See Same Day Exp., Inc* ., 2007 WL 1627310, at *1-4 (finding that petitioner company demonstrated that its drivers, who used own vehicles, supplied own tools, obtained own insurance, set own schedule, paid for own gasoline, received 1099s, could contract with others, were free from the control or direction of the company).

the parties believe they are creating the relation of master and servant." *Mavrikidis*, 153 N.J. at 132 (citing *Restatement (Second) of Agency* § 220(2)). If the parties believe they are entering into an independent contractor agreement, then that fact tips towards finding one. *See Geary*, 7 N.J. Super. at 92. Where, however, the parties intentionally create an employer-employee relationship, or where one party believes that the parties created an employer-employee relationship, then that fact weighs against finding an independent contractor relationship. *Id.*

In this case, the undisputed facts show that the parties understood that they were creating an independent contractor, and not an employee, relationship. The terms of the Franchise Agreement make clear that Kaykov and Royal understood their relationship to be that of principal-independent contractor. (Ex. O, Franchise Agreement ¶ 41 ("Franchisee is, and shall remain, an independent businessman, and shall not be deemed to be an employee or agent of the Franchisor.").) The terms of the Franchise Agreement clearly allow the franchisees to take jobs as they please, to take on their own clients, and to enter into other franchise agreements. Further, there is no evidence in the record that Kaykov expected to receive unemployment benefits if the Franchise Agreement were terminated, or expected to receive workers' compensation or

similar benefits of traditional employment.  Indeed, the
franchisees carried their own worker's compensation and
liability insurance.  Thus, it is clear that the parties' intent
was to form an independent contractor relationship.  *Geary*, 7
N.J. Super. at 92 ("Nor were the parties under any
misapprehension as to the relationship they were creating by
their contract, [with the hauler/contractee] being specifically
designated as 'independent contractor.'  The provisions of the
agreement and the conduct of the parties in its performance lend
emphasis to the existence of that relationship at the time of
the accident.").

    8. Kaykov is an Independent Contractor

    Viewing all of the factors together, the court finds
that the relationship between Royal and Kaykov was not that of
an employer-employee, but that of a principal-independent
contractor.  As discussed, there are material issues of fact
regarding whether Royal actually exercised or retained control
over the manner and means of Kaykov's work by agreement via the
Rulebook, and to a lesser extent, through the Franchise
Agreement.  However, even assuming that, for the purposes of
this motion, Royal did actually exercise or retain control over
Kaykov as set forth in the Franchise Agreement and the Rulebook,
contrary to Fletcher's argument, the court finds that the
totality of the circumstances weighs in favor of finding that an

independent contractor relationship existed as a matter of law.
This is especially so because the record is clear that neither
Royal nor Kaykov believed they were creating an employment
relationship, and entered into an agreement that clearly
contemplated an independent contractor relationship.  The fact
that Kaykov owned his own vehicle and other instrumentalities
necessary for the business and was under no obligation to follow
certain routes, including on the day of the accident, lend
further support for this conclusion.  *See, e.g.*, *Mavrikidis*, 153
N.J 117 at 132 (finding asphalt company to be an independent
contractor where company was hired on a job-by-job basis, the
work was not part of the principal's normal business, the
company supplied most of its own tools and supplies, and the
principal told the company where to lay the asphalt, how much to
bring, and when to come, but did not direct the details of the
work); *Venuto v. Robinson*, 118 F.2d 679, 681-82 (3d Cir. 1941)
(finding truck driver to be an independent contractor even
though driver worked for six months to a year before the
collision, the name of the principal's company was painted on
the truck, and driver signed for shipments on behalf of the
company, where driver owned the truck, was paid by the job, and
intended to create an independent contractor relationship.)

     As the court finds that the relationship between
Kaykov and Royal is not that of employer-employee, but rather

that of a principal-independent contractor, the court will continue on to the *Majestic* exception analysis below.

### B. Exception to a Principal's Immunity from Liability for the Torts of an Independent Contractor

Even though the relationship between Kaykov and Royal is that of principal-independent contractor, Royal may still be liable for Kaykov's torts if the relationship falls within the *Majestic* control exception to principal immunity from liability for the torts of an independent contractor.

As described *supra*, this exception focuses on the retention of control by the principal over the independent contractor and looks to both the right to control by agreement and the day-to-day practices of the principal. *Majestic*, 30 N.J. at 431. The more control retained by the principal, the more likely the principal may be held liable for the torts of the independent contractor. *See, e.g.*, *Mavrikidis*, 153 N.J. at 134-35. As noted, New Jersey courts appear to require a lower threshold of control exercised by the principal in order to find that this exception applies.

In this case, the existence of issues of disputed fact discussed extensively, *supra*, in conjunction with the first Restatement factor (control retained by agreement) are compounded by factual disputes over the actual practices Royal implements, including whether franchisees are required to work

specific shifts and whether Royal receives and responds to complaints by customers, actually inspects the franchisees' vehicles, has a hand in enforcing the Rulebook and/or imposing sanctions on franchisees.

For example, Royal, who the court notes is the moving party, raises a material issue of fact over whether the weekly 4 A.M. to 9 A.M. shift requirement set forth in the Rulebook is actually enforced in practice. (2/28/11 Tr. at 8-10 (conceding that the Rulebook requires drivers to work a specific shift but arguing that the provision is not enforced in practice); *see* Royal's Mem. in Supp. at 10; Ex. Q, Rulebook at 10 (requiring at least one shift per week).) Further, Fletcher points to admissible evidence that raises significant issues of material fact as to how and when drivers' cars were inspected and whether or not Royal had control over this process. (Fletcher's 56.1 ¶ 11; Ex. V, Kaykov's 1/8/09 Dep. at 121.)

Moreover, there are questions of material fact as to whether, in practice, there is sufficient separation between Royal and the Franchisees' Committee to dispel the suggestion, induced by the Rulebook's incorporation into the Franchise Agreement, that Royal retains sufficient control to render the relationship within the control exception. As detailed herein, the Rulebook contains rules related to the day-to-day means and manner of the drivers' work, establishing specifications for

driver attire, driver conduct, vehicle inspections, and
sanctions for failure to comply with the rules. (Fletcher's
56.1 ¶¶ 17-22, 24-32; Ex. Q, Rulebook at 2, 4, 10; Royal's 56.1
¶ 10; Ex. V, Kaykov's 1/8/09 Dep. at 122; Fletcher's 56.1 ¶ 10.)
At oral argument, Royal's counsel was not able to point to any
evidence in the record as to where the Franchisees' Committee
sits, holds meetings, keeps minutes, or carries out the judicial
and penal proceedings outlined in the Rulebook, how complaints
about drivers are received and handled as between Royal and the
Franchisees' Committee, or any other facts that would indicate
an independent Franchisees' Committee. (2/28/11 Tr. at 5, 11,
15-17, 22 (Royal's counsel conceding "I don't know where the
franchisees keep their records . . . I don't know where the
franchisees meet").) Because significant questions of material
fact remain surrounding the creation and implementation of the
Rulebook provisions by Royal, or by Royal through the
Franchisees' Committee, the court finds that a reasonable jury
could find the relationship falls within the control exception.

Thus, even though the court has found that Kaykov is,
as a matter of law, an independent contractor, significant
issues of material facts still remain as to whether or not Royal
exceeded the scope of general supervisory powers and retained or
actually exercised sufficient control over Kaykov to expose it
to liability for Kaykov's acts through the control exception.

Accordingly, the court denies Royal's motion for summary judgment as to the cross-claim of contribution.[21]

### C. Fletcher's Indemnification Cross-Claim is Dismissed

Even if a jury ultimately finds that Royal is vicariously liable for Kaykov's acts, the court finds there is no evidence in the record that Fletcher is entitled to recover from Royal on a theory of indemnification. Although Royal did not explicitly move for summary judgment on the ground of an absence of a contractual or special relationship between Royal and Fletcher, the court may *sua sponte* grant summary judgment where, as here, "it appears clearly upon the record that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court [and that] those materials show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law." *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 140 (2d Cir. 2000) (quoting *Ramsey v. Coughlin*, 94 F.3d 71, 74 (2d Cir. 1996)). A *sua sponte* grant of summary judgment may be reversed where "a court failed to give prior notice and the losing party was procedurally prejudiced, *i.e.*, 'if it [wa]s surprised by the district court's action and that surprise result[ed] in [its] failure to present evidence in support of its position.'"

---

[21] The cross-claim for indemnification will be discussed below.

*Spinale v. Ball*, 352 Fed. App'x 599, 601 (2d Cir. 2009) (quoting *Bridgeway Corp.*, 201 F.3d at 139).

Here, although the court did not explicitly state that it intended to enter summary judgment against Fletcher *sua sponte* on the indemnification cross-claim based on a lack of contractual or special relationship between Royal and Fletcher, it did put Fletcher on notice that it was considering this issue at the oral argument. (2/28/11 Tr. at 30.) Indeed, in response to questioning by the court at oral argument, Fletcher's counsel conceded there is no legal relationship between Royal and was unable to articulate any facts supporting a claim for common law indemnification. (*Id.*) He further acknowledged that the chance of establishing a claim for common law indemnification was "pretty slim," and re-emphasized that his client's primary claim against Royal was one for contribution. (*Id.*) Finally, when given the opportunity to file further submissions, Fletcher's counsel declined. (2/28/11 Tr. at 35.)

Moreover, the court has undertaken an independent review of the record and finds that there is no evidence in the record – disputed or otherwise – that Royal expressly agreed to indemnify Fletcher or that Royal owed an independent duty to Fletcher by virtue of some special relationship between the companies that is sufficient to give rise to a claim for implied indemnity or common law indemnity. *Ruvolo*, 133 N.J. Super. at

63

366. Indeed, Fletcher and Royal had absolutely no relationship prior to being named as co-defendants in the instant action. Without either of these prerequisites, an indemnification claim cannot survive. *Id.*

Discovery is now complete, and it is clear that further discovery on this issue would be of no benefit to Fletcher. *See Ramsey*, 94 F.3d at 74. Thus, the court finds that all of the evidentiary materials that Fletcher might submit in response to a motion for summary judgment have been put before the court and that these materials show that no material dispute of fact exists regarding the lack of any factual basis for Fletcher's indemnification cross-claim. Accordingly, Royal is entitled to judgment as a matter of law and Fletcher's indemnification cross-claim is dismissed.[22]

## CONCLUSION

For the forgoing reasons, Royal's motion for summary judgment is denied as to the cross-claim for contribution and is granted as to the cross-claim for indemnification and as to any independent cross-claim for common law negligence. By April 5, 2011, the parties shall file a joint status letter indicating how they would like to proceed in light of this Memorandum and

---

[22] For the same reasons, the court finds that there is no evidence in the record before the court that Royal owed Fletcher a legal duty or breached that duty necessary to prevail on a negligence claim. Thus, the court grants summary judgment on any independent negligence cross-claim asserted by Fletcher against Royal.

Order.  The joint status letter should indicate whether all parties consent to mediation, as requested by the plaintiffs, and if not, the letter shall jointly propose trial dates beginning in August of 2011.

**SO ORDERED.**

Dated:   March 30, 2011
         Brooklyn, New York

                                    _____ ___/s/_____
                                    Kiyo A. Matsumoto
                                    United States District Judge